## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HARLEYSVILLE INSURANCE COMPANY, et al., | : | No. 3:23-CV-967 |
| | : | |
| | : | (Caraballo, M.J.) |
| Plaintiffs | : | |
| | : | |
| v. | : | |
| | : | |
| SKM INDUSTRIES, INC., et al., | : | |
| | : | |
| Defendants | : | |

### MEMORANDUM

## I.    Introduction

Plaintiffs Harleysville Insurance Company, Nationwide Affinity Insurance Company, Nationwide Mutual Insurance Company, and Harleysville Worchester Insurance Company (collectively "the Nationwide Plaintiffs") seek a declaratory judgment that they owe no duty to defend and indemnify Defendants SKM Industries, Inc. ("SKM"), and Shanta Syal, the President and Chief Executive Officer of SKM (collectively "the SKM Defendants"), under the commercial general liability and umbrella insurance policies issued by the Nationwide Plaintiffs, and pertaining to a District of New Jersey litigation, captioned *Arro-Mark Co. LLC v. Warren*, No. 2:22-CV-6663

("*Arro-Mark*").  The Court has diversity jurisdiction pursuant to Title 28, United States Code, Sections 636(c) and 1332(a).[1]

In their pending motion for judgment on the pleadings (Doc. 61), the Nationwide Plaintiffs contend that they need not defend and indemnify the SKM Defendants for two reasons: (1) the operative third amended complaint in *Arro-Mark* (Doc. 46-5, "the TAC") fails to allege an injury that triggers coverage; and (2) *Arro-Mark* involves an infringement of intellectual property, an access to or disclosure of confidential information, and a knowing violation of another's rights, and thus is precluded from coverage by policy exclusion clauses.  Doc. 62 at 23–24.  The motion is fully briefed and ripe for decision.  Docs. 65–66.

As explained below, the Court holds that the Nationwide Plaintiffs owe no duty to defend or indemnify the SKM Defendants in the *Arro-Mark* litigation.  The allegations in the TAC that the SKM Defendants used an Arro-Mark trademark, and thus an "advertising idea," in an

---

[1] The Nationwide Plaintiffs assert that: (1) the Nationwide Plaintiffs are Ohio corporations with their principal places of business in Ohio; (2) SKM is a Pennsylvania corporation with its principal place of business in Pennsylvania; (3) Syal is a Pennsylvania resident; and (4) Arro-Mark is a New Jersey limited liability company with its principal place of business in New Jersey.  Doc. 46 at 2–3.  The SKM Defendants, while noting "that Plaintiffs failed to seek specific relief against" Arro-Mark, concede that the amount in controversy exceeds $75,000.  Doc. 49 at 2.

2

advertisement, trigger coverage under the policies. Defense and indemnification, however, are precluded by the intellectual property and confidential information exclusions, as all allegations and claims arise out of the SKM Defendants' alleged misappropriation of Arro-Mark Co. LLC's ("Arro-Mark's") trademarks, trade secrets, and other proprietary information. Judgment on the pleadings thus is warranted in favor of the Nationwide Plaintiffs. The Nationwide Plaintiffs fail, however, to show that they are entitled to a reimbursement of defense costs, as a matter of law. The Court thus grants in part and denies in part the motion for judgment on the pleadings.

## II.    Background

### A.    The *Arro-Mark* Litigation

*Arro-Mark* arises out of the alleged infringement of Arro-Mark's intellectual property rights and misappropriation of its trade secrets by the SKM Defendants. According to the TAC, Arro-Mark, the sole plaintiff in *Arro-Mark*, manufactured and distributed "industrial inks and paints for marking devices," including "industrial paint and ink markers . . . [and] paint and ink markers for use on specialized metals employed in such exacting industries as the aerospace, aircraft, nuclear,

3

automotive and other similar industries." Doc. 46-5 at 2. Arro-Mark avers that its competitors, the SKM Defendants, misappropriated its intellectual property, including "trade secrets and other proprietary business information," *id.* at 5, through Arro-Mark's former employees, Cedric Warren and Michael Mamary. *Id.* at 1–3. Warren and Mamary reportedly worked as Arro-Mark's chemist and web and graphic designer, respectively. *Id.* at 5, 9.

More specifically, Warren's duties included "processing chemical formulas for use in the marking devices manufactured and sold by [Arro-Mark], researching and developing new and improved . . . products[,] . . . devising new product ideas and customers," and "securing and protecting [Arro-Mark]'s trade secrets for the formulation of" various products and processes. *Id.* at 5. The TAC alleges that Warren simultaneously and secretly worked for the SKM Defendants, "providing [them] with [Arro-Mark]'s proprietary information," and "encourag[ing] Mamary to apply to work for" the SKM Defendants. *Id.* at 6. The information that Warren provided to the SKM Defendants reportedly led to the SKM Defendants developing and selling new products. *Id.* at 9. The pleading instrument also avers that Warren

4

provided to the SKM Defendants "employees (both former and current), customers, pricing structure, product processes, nib guides, reputation, and . . . [Arro-Mark]'s success and standing[.]" *Id.* at 30.

As for Mamary, Arro-Mark alleges that he was responsible for, among other things, "creating and maintaining [Arro-Mark]'s website and e-commerce store," *id.*, and "develop[ing] and publish[ing Arro-Mark]'s website, which took him approximately 18 to 24 months to complete." *Id.* at 10. Mamary reportedly used this experience to create a website for the SKM Defendants that was visually and functionally "identical" to Arro-Mark's. *Id.* at 9–25. SKM's new website, now made unavailable by the SKM Defendants, allegedly took Mamary only a month to complete. *Id.* at 30.

Arro-Mark alleges that SKM, by using the proprietary information that it acquired via Warren and Mamary, began to manufacture "industrial inks, paints[,] and marking device[s] . . . that it has never made before, using products, raw materials, formulas, nib guides, and more unknown trade secrets and proprietary information of [Arro-Mark's]." *Id.* at 26. Arro-Mark also claims that it owns the "Mighty Marker" and "Bleed-Thru" trademarks, that two of the new SKM

5

products carry the "Mighty Marker" logo, and that another SKM product is titled "Bleed Thru Ink Marker." *Id.* at 33–36. Arro-Mark further avers that the SKM Defendants "used the identical valve control image on its website, promotional material[s]" (which were reportedly "distributed at trade shows"), *id.* at 32, and advertisements. *Id.* at 49.

Further, Arro-Mark asserts that, on June 6, 2023, it became aware of SKM's products through a potential customer, who "purchased what was believed to be [it]s Mighty[ ]Marker but was not provided with the appropriate laboratory certifications from [an] authorized distributor." *Id.* at 28. The customer stated that Arro-Mark "kept showing up during online searches." *Id.* (quotation omitted). Then Arro-Mark "confirmed with [the distributor] that the product was in fact not an Arro-Mark Mighty Marker, [and] that even distributors are confusing [Arro-Mark]'s Mighty Marker from SKM Defendants' infringing Mighty Marker." *Id.* at 28–29.

Based on this factual background, Arro-Mark filed suit in the District of New Jersey on November 17, 2022. No. 2:22-CV-6663, Doc. 1. The company has since amended its complaint three times. *Id.* Docs. 47; 123; 177.

Arro-Mark's second amended complaint, as correctly reported by the Nationwide Plaintiffs, Doc. 62 at 14–15, advanced 20 claims against the defendants in *Arro-Mark*:

- **Count 1**: Trade secret misappropriation, under the federal Defend Trade Secrets Act;
- **Count 2**: Trade secret misappropriation, pursuant to the New Jersey Trade Secrets Act;
- **Count 3**: Agreement to restrain trade, under the Sherman Act;
- **Count 4**: Agreement to restrain trade, pursuant to the New Jersey Anti-Trust Act;
- **Count 5**: Common law civil conspiracy;
- **Count 6**: Common law tortious interference with prospective economic advantage;
- **Count 7**: Common law unjust enrichment;
- **Count 8**: Common law misappropriation;
- **Count 9**: Common law breach of loyalty;
- **Count 10**: Trademark infringement, under the Lanham Act;
- **Count 11**: Common law trademark infringement;
- **Count 12**: False association, pursuant to the Lanham Act;
- **Count 13**: Common law unfair competition;
- **Count 14**: Violation of Section 2 of the Sherman Act;
- **Count 15**: Trademark dilution, under Section 1125(c)(1) of the Lanham Act;
- **Count 16**: Trademark dilution, pursuant to the New Jersey Revised Statutes;
- **Count 17**: Unfair competition, under Section 1125(a) of the Lanham Act;

- **Count 18**: Trade dress infringement, pursuant to Section 1125 of the Lanham Act;
- **Count 19**: Trademark counterfeiting, under Section 1701 of the Lanham Act; and
- **Count 20**: Trademark counterfeiting, pursuant to the New Jersey Revised Statutes.

Doc. 46-5 at 36–89.

On November 8, 2023, the SKM Defendants moved to dismiss the second amended complaint. No. 2:22-CV-6663, Doc. 130. On September 5, 2024, the *Arro-Mark* court granted in part and denied in part the motion, dismissing Counts 3–6, 11, 14–16, and 18. *Id.* Docs. 173–74. Relevantly, the *Arro-Mark* court held that Count 18 fell short of the Rule 12(b)(6) pleading standard for its failure to identify the characteristics that "constitute protectable trade dress." *Id.* Doc. 173 at 34. The District of New Jersey accordingly dismissed the nine theories, and granted Arro-Mark leave to amend its complaint. *Id.* at 37.

On October 4, 2024, Arro-mark filed the TAC. *Id.* Doc. 177. The pleading instrument, aside from occasional grammatical or other immaterial corrections, presents the same factual averments in advancing the remaining 11 causes of action:

- **Count 1**: Trade secret misappropriation, under the federal Defend Trade Secrets Act;

8

- **Count 2**: Trade secret misappropriation, pursuant to the New Jersey Trade Secrets Act;
- **Count 3**: Common law unjust enrichment;
- **Count 4**: Common law misappropriation;
- **Count 5**: Common law breach of loyalty;
- **Count 6**: Trademark infringement, under the Lanham Act;
- **Count 7**: False association, pursuant to the Lanham Act;
- **Count 8**: Common law unfair competition;
- **Count 9**: Unfair competition, under Section 1125(a) of the Lanham Act;
- **Count 10**: Trademark counterfeiting, pursuant to Section 1701 of the Lanham Act; and
- **Count 11**: Trademark counterfeiting, under the New Jersey Revised Statutes.

Doc. 46-5 at 36–70. Since then, the parties have engaged in mediation and discovery. *See, e.g.*, No. 2:22-CV-6663, Docs. 216; 229.

## B.    Nationwide Insurance Policies

The parties do not dispute the relevant terms of the underlying policies, all issued to SKM. Docs. 62 at 17–23; 65 at 9–11. Plaintiffs Harleysville Insurance Company and Nationwide Affinity Insurance Company issued three general commercial liability policies (collectively "the General Policies"), attached to the second amended complaint in

this action.[2]  Docs. 46-6 to -8.  Namely, Plaintiff Harleysville Insurance Company issued two policies, both numbered GL00000048060B, effective from April 17, 2020, to April 17, 2021, and from April 17, 2021, to April 17, 2022, respectively.  Docs. 46-6 at 16; 46-7 at 14.  Plaintiff Nationwide Affinity Insurance Company issued the third policy, numbered CG013200635005 and effective from April 17, 2022, to April 17, 2023.  Doc. 46-8 at 7.

The General Policies each state, in relevant part, that:

**SECTION I – COVERAGES**

**COVERAGE  B  PERSONAL  AND  ADVERTISING INJURY LIABILITY**

**1. Insuring Agreement**

  a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply.  . . .

  b. This insurance applies to "personal and advertising injury" caused by an offense arising out of your

---

[2] When ruling on a motion for judgment on the pleadings, the Court may consider pleadings and their allegations, exhibits, matters of public record, and authentic documents. *See, e.g.*, *Pension Benefit Guar. Corp. v. White Consol. Indus. Inc.*, 998 F.2d 1192, 1196–97 (3d Cir. 1993).

business[,] but only if the offense was committed in the "coverage territory" during the policy period.

. . .

## 2. Exclusions

This insurance does not apply to:

. . .

### i. Infringement Of Copyright, Patent, Trademark Or Trade Secret

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret[,] or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement[."]

However, this exclusion does not apply to infringement, in your "advertisement[,"] of copyright, trade dress[,] or slogan.

. . .

## SECTION V – DEFINITIONS

1. "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products[,] or services for the purpose of attracting customers or supporters. For the purposes of this definition:

   a. Notices that are published include material placed on the Internet or on similar electronic means of communication; and

11

b. Regarding web-sites, only that part of a website that is about your goods, products[,] or services for the purposes of attracting customers or supporters is considered an advertisement.

. . .

14. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

. . .

f. The use of another's advertising idea in your "advertisement" . . .

Docs. 46-6 at 23, 28, 34, 36; 46-7 at 21, 26, 32, 34; 46-8 at 71, 75, 81–83.

The General Policies are subject to an endorsement, which provides:

B. The following is added to Paragraph **2. Exclusions of Section I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Access Or Disclosure Of Confidential Or Personal Information**

"Personal and advertising injury" arising out of any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information[,] or any other type of nonpublic information.

12

> This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses[,] or any other loss, cost[,] or expense incurred by you or others arising out of any access to or disclosure of any person's or organization's confidential or personal information.

Docs. 46-6 at 50; 46-7 at 48; 46-8 at 97.

In addition to the General Policies, Plaintiffs Harleysville Worchester Insurance Company and Nationwide Mutual Insurance Company issued three umbrella policies to SKM (collectively "the Umbrella Policies"), which covered the same period as their counterparts. Docs. 46-9 to -11. Specifically, Plaintiff Harleysville Worchester Insurance Company issued two policies, both numbered CMB00000078466B, and effective from April 17, 2020, to April 17, 2021, and from April 17, 2021, to April 17, 2022, respectively. Docs. 46-9 at 8; 46-10 at 6. Plaintiff Nationwide Mutual Insurance Company issued the third policy, numbered CU013200635005, and effective from April 17, 2022, to April 17, 2023. Doc. 46-11 at 7.

The Umbrella Policies each contain language that substantially mirrors the relevant provisions of the General Policies:

**SECTION I – COVERAGES**

. . .

13

## COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY

### 1. Insuring Agreement

a. We will pay on behalf of the insured the "ultimate net loss" in excess of the "retained limit" because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking damages for such "personal and advertising injury" when the "underlying insurance" does not provide coverage or the limits of "underlying insurance" have been exhausted. When we have no duty to defend, we will have the right to defend, or to participate in the defense of, the insured against any other "suit" seeking damages to which this insurance may apply. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. . . .

b. This insurance applies to "personal and advertising injury" caused by an offense arising out of your business[,] but only if the offense was committed in the "coverage territory" during the policy period.

### 2. Exclusions

This insurance does not apply to:

a. "Personal and advertising injury":

. . .

    **i. Infringement Of Copyright, Patent, Trademark Or Trade Secret**

14

Arising out of the infringement of copyright, patent, trademark, trade secret[,] or other intellectual property rights.  Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement[."]

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress[,] or slogan.

. . .

## SECTION V – DEFINITIONS

1. "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products[,] or services for the purpose of attracting customers or supporters.  For the purposes of this definition:

   a. Notices that are published include material placed on the Internet or on similar electronic means of communication; and

   b. Regarding websites, only that part of a website that is about your goods, products[,] or services for the purposes of attracting customers or supporters is considered an advertisement.

. . .

14. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

. . .

15

  f. The use of another's advertising idea in your "advertisement"[] . . .

  . . .

19. "Retained limit" means the available limits of "underlying insurance" scheduled in the Declarations or the "self-insured retention[,"] whichever applies . . .

. . .

24. "Underlying insurance" means any policies of insurance listed in the Declarations under the Schedule of "underlying insurance" . . .

Docs. 46-9 at 14, 18, 26–29; 46-10 at 12, 16, 24–27; 46-11 at 71, 75–76, 165–68. Like their counterparts, the Umbrella Policies are also subject to an endorsement, which provides:

  **B.** The following is added to Paragraph **2. Exclusions of Section I – Coverage B – Personal And Advertising Injury Liability:**

  **2. Exclusions**

  This insurance does not apply to:

  **Access Or Disclosure Of Confidential Or Personal Information**

  "Personal and advertising injury" arising out of any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health

16

> information[,] or any other type of nonpublic information.
>
> This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost[,] or expense incurred by you or others arising out of any access to or disclosure of any person's or organization's confidential or personal information.

Docs. 46-9 at 41; 46-10 at 38; 46-11 at 97, 187.

## C.    The Instant Action

The Nationwide Plaintiffs commenced this suit against Arro-Mark[3] and the SKM Defendants on June 12, 2023.  Doc. 1.  Plaintiffs seek a declaratory judgment that, under the General Policies and Umbrella Policies, they owe neither a duty to defend, nor to indemnify the SKM Defendants in the *Arro-Mark* litigation.  *Id.*  On November 1, 2023, the Nationwide Plaintiffs submitted an amended complaint, Doc. 17, which all defendants answered.  Docs. 20–22.  On February 6, 2024, the Nationwide Plaintiffs filed a motion for judgment on the pleadings.  Doc. 33.

---

[3] Although Arro-Mark filed an answer to the first amended complaint, Doc. 20, and did not oppose the SKM Defendants' motion to extend the deadline for answering the second amended complaint, Doc. 47, Arro-Mark did not answer the second amended complaint.  In any event, this omission does not affect the Court's analysis.

17

Consequently, the Nationwide Plaintiffs moved to file a second amended complaint on December 19, 2024. Doc. 42. The Court granted the motion, Doc. 45, and the Nationwide Plaintiffs lodged the operative second amended complaint on January 10, 2025. Doc. 46. The SKM Defendants answered, Doc. 49, and thereafter the Nationwide Plaintiffs filed the pending motion for judgment on the pleadings. Doc. 61. The motion is fully briefed and ripe for decision. Docs. 62; 66.

## III. Discussion

### A. Legal Standard

Pursuant to the Declaratory Judgment Act, "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading," such as a Rule 12(c)(1) motion, "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. In the context of a declaratory judgment action, "[a] court can enter a declaratory judgment 'if, and only if, it affects the behavior of the defendant toward the plaintiff.'" *Hartnett v. Pa. State Educ. Ass'n*, 963 F.3d 301, 307 (3d Cir. 2020) (quoting *Rhodes v. Stewart*, 488 U.S. 1, 4 (1988) (per curiam)).

18

A party may seek judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial . . . ." Fed. R. Civ. P. 12(c). "A motion for judgment on the pleadings based on the defense that the plaintiff has failed to state a claim is analyzed under the same standards that apply to a Rule 12(b)(6) motion." *Zimmerman v. Corbett*, 873 F.3d 414, 417 (3d Cir. 2017) (quotation omitted) (quoting *Revell v. Port Auth. of N.Y., N.J.*, 598 F.3d 128, 134 (3d Cir. 2010)). Judgement under Rule 12(c) is granted only if "the movant clearly establishes that no material issue of fact remains to be resolved *and* that he is entitled to judgment as a matter of law." *Rosenau v. Unifund Corp.*, 539 F.3d 218, 221 (3d Cir. 2008) (emphasis added) (quoting *Jablonski v. Ran Am. World Airways, Inc.*, 863 F.2d 289, 290–91 (3d Cir. 1988)).

## B.    Personal or Adverting Injury Coverage

As the Court sits in diversity, it applies Pennsylvania law. *Lafferty v. St. Riel*, 495 F.3d 72, 76 (3d Cir. 2007) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (2007)). "Under Pennsylvania law, an insurer has a duty to defend if the complaint filed by the injured party potentially comes within the policy's coverage." *Sikirica v. Nationwide Ins. Co.*, 416 F.3d 214, 225 (3d Cir. 2005) (citing *Pac. Indem. Co. v.*

*Linn*, 766 F.2d 754, 760 (3d Cir. 1985)). "The duty to defend is a distinct obligation, different from and broader than the duty to indemnify." *Id.* (citations omitted). "Because the duty to defend is broader than the duty to indemnify, there is no duty to indemnify if there is no duty to defend." *Id.* at 225–26 (citations omitted).

The analysis involves a burden-shifting scheme, under which the insured must first "show [that] a claim [falls] within the coverage provided by the [contested] policy." *Erie Ins. Exch. v. Transamerica Ins. Co.*, 533 A.2d 1363, 1366 (Pa. 1987) (first quoting *Warner v. Employers' Liab. Assurance Corp.*, 133 A.2d 231, 233 (Pa. 1957); and then quoting *Miller v. Bos. Ins. Co.*, 218 A.2d 275, 277 (Pa. 1966)). "Although the insured bears the burden of establishing coverage, . . . the underlying complaint's allegations are assumed to be true and are liberally construed in favor of coverage." *Vitamin Energy, LLC v. Evanston Ins. Co.*, 22 F.4th 386, 392 (3d Cir. 2022) (citations omitted). "After determining the scope of coverage under a policy, the court must examine the complaint in the underlying action to determine whether it triggers coverage." *Sikirica*, 416 F.3d at 226 (citing *Gen. Accident Ins. Co. of Am. v. Allen*, 692 A.2d 1089, 1095 (1997)). In doing so,

20

"Pennsylvania courts consistently apply . . . the four-corners rule." *Sapa Extrusions, Inc. v. Liberty Mut. Ins. Co.*, 939 F.3d 243, 249 (3d Cir. 2019) (quotation omitted) (citing *Lupu v. Loan City LLC*, 903 F.3d 382, 289–90 (3d Cir. 2018)). That is, the analysis "compar[es] the four corners of the insurance contract to the four corners of the complaint. We do not consider extrinsic evidence." *Id.* at 251–52 (citations and quotation omitted).

The four-corners rule involves a three-step analysis. *Id.* at 252. First, the Court "examines the policies' terms, which are manifestations of the parties' intent." *Id.* (cleaned up). In doing so, the Court "review[s] the plain language of a policy to determine its meaning." *Id.* at 252 n.4 (citing *Donegal Mut. Ins. Co. v. Baumhammers*, 938 A.2d 286, 290 (Pa. 2007)). "If the text is clear, [the Court] enforce[s] it as written." *Id.* (citing *Donegal*, 938 A.2d at 290). "If the language is ambiguous, [the Court] construe[s] it in favor of the insured." *Id.* (citing *Donegal*, 938 A.2d at 290). Second, the Court "assess[es] relevant precedent[s] interpreting the operative policy terms." *Id.* at 252.

21

Third, the Court "compares the terms of the policies to the allegations in the underlying complaint, determining whether its factual allegations trigger the policies' provisions of coverage." *Id.* (cleaned up).

A "duty to defend is triggered by the factual averments in the underlying complaint." *Id.* at 249 (cleaned up). That is, "[i]f the allegations of the underlying complaint *potentially* could support recovery under the policy, there will be coverage at least to the extent that the insurer has a duty to defend its insured in the case." *Id.* (first quoting *Ramara, Inc. v. Westfield Ins. Co.*, 814 F.3d 660, 673 (3d Cir. 2016); and then citing *Am. & Foreign Ins. Co. v. Jerry's Sport Ctr., Inc.*, 2 A.3d 526, 541 (Pa. 2010)). In sum, "facts matter more than labels." *Id.* at 252 (citing *Mut. Ben. Ins. Co. v. Haver*, 725 A.2d 743, 745 (Pa. 1999)). "Furthermore, if a single claim in a multiclaim lawsuit is potentially covered, the insurer must defend all claims until there is no possibility that the underlying plaintiff could recover on a covered claim." *Frog, Switch & Mfg. Co., Inc. v. Travelers Ins. Co.*, 193 F.3d 742, 746 (3d Cir. 1999).

22

### 1. *Advertising Idea Coverage*

The parties dispute whether the SKM Defendants used an Arro-Mark "advertising idea" in an advertisement, to trigger coverage of a personal and advertising injury under the policies. The General and Umbrella Policies cover "personal and advertising injury," which is defined, in relevant part, as injury "arising out of . . . [t]he use of another's advertising idea in [the insured's] 'advertisement.'" Docs. 46-6 at 36; 46-7 at 34; 46-8 at 83; 46-9 at 27; 46-10 at 25; 46-11 at 167. As aptly noted by the Court of Appeals, "[t]he definition of 'advertising injury' in standard business insurance policies has troubled and in some cases confounded courts for years." *Frog*, 193 F.3d at 744. As set forth below, the SKM Defendants' alleged use of Arro-Mark's trademarks on the SKM website and in promotional materials potentially could support recovery under the policy, thus warranting coverage.

Pennsylvania courts hold that the phrase "arising out of" is a causal one. *See, e.g., Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 110 (Pa. 1999) ("phrase 'arising out of[]' . . . indicate[s] 'but for' or 'cause and result' relationship" (citing *McCabe v. Old Republic Ins. Co.*, 228 A.2d 901, 903 (1967))). The policies define an

"advertisement" to include "a notice that is broadcast or published to the general public or specific market segments about your goods, products[,] or services for the purpose of attracting customers or supporters . . . material placed on the Internet or on similar electronic means of communication; and . . . only that part of a website that is about your goods, products or services for the purposes of attracting customers or supporters." Docs. 46-6 at 34; 46-7 at 32; 46-8 at 81–82; 46-9 at 26; 46-10 at 24; 46-11 at 165–66. The parties do not appear to dispute that the website allegedly created by Mamary for the SKM Defendants constituted an advertisement. And the SKM Defendants also highlight Arro-Mark's allegations that SKM used Arro-mark's trademarks in promotional materials. Doc. 46-5 ¶¶ 129, 209, 211.

Against that backdrop, the Court must resolve the parties' primary dispute: whether the SKM Defendants used an Arro-Mark advertising idea. The Nationwide Plaintiffs contend that the TAC does not allege that Arro-Mark "developed an advertising idea that [the SKM Defendants] then used . . . in [their] own advertising." Doc. 62 at 27. Specifically, the Nationwide Plaintiffs aver that the visual, operational, and functional similarities between Arro-Mark's website and the SKM

24

Defendants' website do not evince novel and new advertising ideas, and dismiss the notion that the SKM Defendants' use of Arro-Mark's trademarks constitutes an advertising idea. *Id.* at 28–31.  The SKM Defendants leverage both premises in seeking coverage.  Doc. 65 at 19–20.

As the policies do not define "advertising idea," the Court turns to relevant precedent.  *Sapa*, 939 F.3d at 252.  Under Pennsylvania law, an advertising idea is "an idea about the solicitation of business and customers," *Green Mach. Corp. v. Zurich-Am. Ins. Grp.*, 313 F.3d 837, 839 (3d Cir. 2002) (footnote omitted) (citing *Frog*, 193 F.3d at 748), that is "definite and concrete" and "novel and new." *Thomas v. R. J. Tobacco Co.*, 38 A.2d 61, 63 (Pa. 1944) (citation omitted).  Also, an advertising idea must be "capable of being identified as having been created by one party and stolen or appropriated by another." *Sorbee Int'l Ltd. v. Chubb Custom Ins. Co.*, 735 A.2d 712, 714 (Pa. Super. Ct. 1999) (citations omitted).  In other words, a "straightforward descriptive material not formed or sequenced in any way so as to constitute novel or special usage" is not entitled to legal protection. *See id.*  As the Court of Appeals stated, coverage for use of an advertising idea requires that the

"allegations . . . have to involve an advertising idea, not just a nonadvertising idea that is made the subject of advertising." *Frog*, 193 F.3d at 748 (emphasis omitted). Further, coverage is absent if the allegations fail to state that the insured used a third-party's advertising idea in its own advertisement without permission. *See Desabato v. Assurance Co. of Am.*, 213 F. Supp. 3d 735, 745 (W.D. Pa. 2016).

Specific to trademark misappropriation, the Court of Appeals initially and persuasively stated that:

> We will assume for the sake of argument that trademark infringement is "misappropriation of an advertising idea or style of doing business" under Pennsylvania law. . . . A trademark can be seen as an "advertising idea": It is a way of marking goods so that they will be identified with a particular source. . . . A trademark depends for its effectiveness on communicating a message to consumers about the marked good, which is the essence of advertising, and therefore allegations of trademark infringement arguably allege misappropriation of an advertising idea.

*Frog*, 193 F.3d at 749 (citing *Northam Warren Corp. v. Universal Cosm. Co.*, 18 F.2d 774, 774 (7th Cir. 1927) ("A trade-mark is but a species of advertising, its purpose being to fix the identity of the article and the name of the producer in the minds of people who see the advertisement[.]")).

Although the Pennsylvania Supreme Court has not yet determined whether trademark infringement is a covered offense under advertising injury insurance provisions, the Court of Appeals has since "h[e]ld that when a complaint alleges that an insured misappropriates and uses trademarks or ideas in connection with marketing and sales and for the purpose of gaining customers, the conduct constitutes 'misappropriation of an advertising idea or style of doing business' under Pennsylvania law." *CAT Internet Servs., Inc. v. Providence Wash. Ins. Co.*, 333 F.3d 138, 142 (3d Cir. 2003). The logic underlying *Frog* and *CAT* is sound, and the Court predicts that the Pennsylvania Supreme Court would agree that trademark infringement in an advertisement constitutes misappropriation of an advertising idea. *Nationwide Mut. Ins. Co. v. Buffetta*, 230 F.3d 634, 637 (3d Cir. 2000); *see also Sorbee*, 735 A.2d at 716 ("It makes sense that a trademark infringement action would be covered by an insurance policy that applies to 'misappropriation of advertising ideas' because a trademark . . . is an advertising idea that may be created and 'owned,' and thus wrongfully taken or 'stolen.'").

27

Here, an examination of the TAC readily concludes that coverage under the General and Umbrella Policies is warranted, in consideration of SKM's alleged use, on its website and in promotional materials, of Arro-Mark's trademarks. The TAC not only advances trademark infringement and counterfeiting claims, Doc. 46-5 at 47–55, 65–70, but contains extensive associated allegations detailing the SKM Defendants' purported trademark infringement and misappropriation scheme, and its direct link to SKM's advertising efforts.

A key theme of the TAC lies in allegations that "SKM has been marketing its products utilizing Plaintiff's trademarks, marks, descriptions, given to Shanta and SKM by Mamary and Warren." *Id.* ¶ 78. For example, Arro-Mark avers that the SKM Defendants usurped Arro-Mark's valve-controlled design mark image and trademarks (including "Mighty Marker" and "Bleed-Thru") on SKM's website, and that some of the SKM Defendants' competing products displayed identical or similar trademarks. *Id.* at 32–36. Indeed, Arro-Mark specifically alleges that the SKM Defendants misappropriated the "Might Marker Trademark, Arro-Mark's seminal brand," *id.* at 33–35, and that "SKM now advertises a marker exactly as 'Mighty Marker DG'

28

that SKM calls 'Muscle Man.'" *Id.* ¶ 117.  Arro-Mark further avers that SKM "sells a marker called High Purity Pump Action with the word mark 'Mighty Marker' on the label," and "also sells the 'Low Chloride' marker, with Arro-Mark's wordmark 'Mighty Marker.'" *Id.* ¶¶ 135–36. Likewise, after noting its ownership of the "Valve Controlled design mark for 'Felt Tip Marking Pens,'" Arro-Mark specifically avers that "[t]he SKM Defendants, without the authorization of Arro-Mark, used the identical valve control image on its website and promotional material, which material have been distributed at trade shows such as 'Fabtech' held in Atlanta, Georgia on November 8-10, 2022, which had over 30,000 attendees." *Id.* ¶ 129.  Other similar allegations are advanced throughout the TAC, including for other Arro-Mark trademarks.  *See, e.g., id.* ¶¶140–42.

The Nationwide Plaintiffs attack the notion that trademark infringement in advertising and marketing materials does not constitute an "advertising idea" by leveraging nonbinding authorities such as *Sterngold Dental, LLC v. HDI Glob. Ins. Co.*, 929 F.3d 1 (1st Cir. 2019), which applies Massachusetts law, and *Laney Chiropractic & Sports Therapy, P.A. v. Nationwide Mut. Ins. Co.*, 866 F.3d 254 (5th Cir.

2017), which discusses Texas law.  Doc. 62 at 28–29.  But those decisions bear no relevance when interpreting Pennsylvania law, or following the precedential authority first suggested in *Frog*, 193 F.3d at 749 ("A trademark can be seen as an 'advertising idea': It is a way of marking goods so that they will be identified with a particular source), and then mandated in *CAT*.  333 F.3d at 142 ("when a complaint alleges that an insured misappropriates and uses trademarks or ideas in connection with marketing and sales and for the purpose of gaining customers, the conduct constitutes 'misappropriation of an advertising idea . . . .'").  Indeed, the logic set forth in those decisions is sound, as a key purpose of a website is to advertise a company's products, and trademarks are designed to notify customers of a company's brand and product quality, thus rendering their combination a "novel and new" means of advertising a product.  *Thomas*, 38 A.2d at 63.  And here, a core theme of the TAC lies in Arro-Mark's allegations that SKM used Arro-Mark's trademarks on the SKM website, causing confusion among Arro-Mark's customer base, and a consummate loss of revenue through the misappropriation of that advertising idea.  *See, e.g.*, Doc. 46-5 ¶¶ 94–99.

30

To refute those precedential decisions, the Nationwide Plaintiffs repeatedly emphasize that both *Frog* and *CAT* addressed "pre-2001 amendments to the coverage forms whereby 'misappropriation of an advertising idea or style of doing business' was replaced with 'use of another's advertising idea in your "advertisement"'" which is the language included in the Policies." Docs. 62 at 29; 66 at 3–4. No rationale is offered in support of the distinction, however, beyond contending that the SKM Defendants have not offered any authority specific to the new formulation of the policy language; an exercise in semantics that fails to detract from the logical reasoning set forth in both Court of Appeals decisions.

Likewise, the Nationwide Plaintiffs' attempt to leverage *Vitamin Energy*, 22 F.4th 386, for the proposition that "allegations of trademark infringement did not potentially trigger coverage for 'advertising injury,'" Doc. 62 at 30, stretches the decision beyond its parameters. In *Vitamin Energy*, the Court of Appeals addressed solely whether alleged "false and misleading comparative advertising," triggered coverage under a policy provision covering advertising injury arising out of disparaging material in the insured's advertisements. 22 F.4th at 389,

31

392–93. In finding coverage, the Court of Appeals held that allegations of trademark infringement in the underlying complaint could not negate the insurer's duty to defend on the basis of reportedly disparaging advertising, and specifically noted that the insured did not seek coverage on the basis of trademark infringement. *Id.* at 394–95. Not so here, where the primary premise on which the SKM Defendants seek coverage is their alleged misappropriation and use of Arro-Mark's trademarks in advertisements.[4]

A liberal construal of the allegations set forth in the TAC, *see Vitamin Energy*, 22 F.4th at 392, readily concludes that they "potentially could support recovery under the policy," and thus trigger the Nationwide Plaintiffs' duty to defend. *Sapa*, 939 F.3d at 249. Accordingly, the Court finds that coverage is warranted under the terms of the General and Umbrella Policies.

### 2. *Copyright, Trade Dress, or Slogan Coverage*

Although the Court's finding of coverage under the advertising idea provisions of the policies renders additional coverage evaluations

---

[4] As the alleged trademark infringements trigger coverage, the Court need not discuss whether averments concerning the SKM Defendants' website offer an additional basis for coverage.

unnecessary, a brief discussion of the trade dress infringement clause is warranted, as it proves relevant to the Court's subsequent analysis of the intellectual property exclusion. As set forth below, the trade dress infringement clause does not provide an alternative means of coverage for the SKM Defendants.

The General and Umbrella Policies state that a "personal and advertising injury" may "aris[e] out of" an "infring[ement of] another's copyright, trade dress[,] or slogan in [the insured's] 'advertisement.'" Docs. 46-6 at 36; 46-7 at 34; 46-8 at 83; 46-9 at 27; 46-10 at 25; 46-11 at 167. As the parties do not discuss copyright in their pleadings, and the SKM Defendants seemingly concede the Nationwide Plaintiffs' position that the TAC does not allege infringement of a trade slogan,[5] the Court discusses only whether the TAC alleges trade dress infringement.

The Nationwide Plaintiffs highlight that the *Arro-Mark* court, "recogniz[ing] that the factual allegations [concerned] misappropriation

_____

[5] *See, e.g.*, *Lee v. Park*, 720 F. App'x 663, 666 (3d Cir. 2017) ("failure to respond to the pertinent . . . argument acts as a concession of that argument." (first citing *Griswold v. Coventry First LLC*, 762 F.3d 264, 274 n.8 (3d Cir. 2014); and then citing *John Weyth & Brother Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997))); *McClung v. 3M Co.*, 2019 WL 4668053, at *4 (D.N.J. 2019) ("it is not the responsibility of the Court to either formulate arguments for a party or to search the record for evidence to support a party's arguments, particularly one represented by sophisticated counsel." (citations omitted)).

of trade secrets and infringement of trade[]marks, not infringement of trade dress," dismissed Arro-Mark's trade dress infringement claim. Doc. 62 at 31–32. Concomitantly, the Nationwide Plaintiffs aver that the TAC fails to "identify any elements of SKM's website or promotional materials" that meet the pleading requirements for a viable trade dress infringement claim. *Id.* at 32–34.

The SKM Defendants respond that the TAC repeatedly avers that SKM "wrongfully used various 'promotional materials' – other than SKM's website – to attract and engage customers and to unfairly compete in the marketplace," and "have infringed upon its trade dress in SKM's advertising and promotion of its products." Doc. 65 at 20. To support their position, they reference several paragraphs in the TAC. *Id.* (citing Doc. 46-5 ¶¶ 129, 209, 211, 224, 237, 261, 389, 393, Ex. I). A review of those paragraphs, however, concludes that they either allege various instances of trademark infringement, or fall short of pleading trade dress infringement.

Trade dress "refers to the design or packaging of a product which serves to identify the product's source." *Shire US Inc. v. Barr Laboratories Inc.*, 329 F.3d 348, 353 (3d Cir. 2003) (citing *TrafFix*

*Devices, Inc. v. Mktg. Displays, Inc.,* 532 U.S. 23, 28 (2001)). Trade dress consists of "the total image or overall appearance of a product, and includes, but is not limited to, such features as size, shape, color or color combinations, texture, graphics, or even a particular sales technique." *Rose Art Indus., Inc. v. Swanson,* 235 F.3d 165, 171 (3d Cir. 2000) (citing *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 765 n.1 (1992)). "To establish infringement of an unregistered trade dress, a plaintiff must prove that (1) the allegedly infringing feature is non-functional, (2) the feature is inherently distinctive or has acquired secondary meaning, and (3) consumers are likely to confuse the source of the plaintiff's product with that of the defendant's product." *Shire,* 329 F.3d at 353 (citing *Wal-Mart Stores, Inc. v. Samara Bros., Inc.,* 529 U.S. 205, 210–11 (2000)).

Here, the provisions of the TAC leveraged by the SKM Defendants to advance a theory of trade dress infringement in promotional materials largely concern infringement of the Arro-Mark registered Valve Controlled design mark, its Mighty Marker trademark, and its Bleed-Thru trademark. Doc. 46-5 ¶¶ 129, 209, 211, 224, 237, 261, 389, 393, Ex. I. Even to the extent that those, and other allegations in the

35

TAC, can be construed as referencing product descriptions and sales techniques above and beyond trademarks, *see, e.g., id.* ¶¶ 78, 117, 129, 389, 393, they fail to aver the identifying materials and distinctiveness necessary to advance a trade dress infringement theory.

Indeed, for those very reasons, the *Arro-Mark* court, when dismissing the underlying trade dress infringement claim, held that Arro-Mark failed to

> identify "[t]he digital photographs and artwork, promotional materials, and informational materials created by Plaintiff" that constitute protectable trade dress. Similarly, Arro-Mark's statement that "layouts, and design elements, including the placement of specific phrases, words, photographs, colors, boarders, backgrounds, interactive elements, movement of markers, and overall mood, style and impression" constitute trade dress does not identify specific elements that comprise distinct trade dress.

No. 2:22-CV-6663, Docs. 173 at 34 (footnote omitted); 174. This ruling led to Arro-Mark lodging the TAC, which advances substantively identical factual allegations. Doc. 177. Thus, the Court, even when viewing those allegations in the light most favorable to the SKM Defendants, agrees with the Nationwide Plaintiffs that the TAC's allegations cannot lead to recovery for trade dress infringement. *See Sapa*, 939 F.3d at 252. And the duty to defend exists only "as long as at

36

least one claim is potentially covered by the policy." *Post v. St. Paul Travelers Ins. Co.*, 691 F.3d 500, 521 (3d Cir. 2012).

Therefore, absent coverage provided by the "advertising idea" provisions of the policies, the trade dress infringement provisions would not alternatively give rise to a duty to defend; a conclusion that bears relevance to the Court's analysis of the intellectual property exclusion clause below.

## C.    Exclusionary Clauses

Despite finding coverage under the advertising idea provisions of the policies, the Court agrees with the Nationwide Plaintiffs that the intellectual property and confidential information exclusions discharge their duty to defend. The remaining claims in the TAC all arise out of allegations that the SKM Defendants infringed Arro-Mark's trademarks, misappropriated its trade secrets, and misappropriated its confidential and propriety information, thus falling within the ambit of the exclusion provisions.[6]

---

[6] As the intellectual property and confidential information exclusions foreclose coverage, the Court does not address the third exclusion discussed by the parties, for "knowing violations of another's rights."

37

If the insured satisfies the initial inquiry about whether the operative pleading triggers coverage, then the burden shifts to the insurer, who may present an affirmative defense in the form of an exception or an exclusion precluding indemnification. *Sapa*, 939 F.3d at 252 (first quoting *Armon v. Aetna Cas. & Sur. Co.*, 87 A.2d 302, 304 (Pa. 1952); and then quoting *Miller*, 218 A.2d at 277). Exclusions, too, "are always strictly construed against the insurer and in favor of the insured." *Nationwide Mut. Ins. Co. v. Cosenza,* 258 F.3d 197, 206–07 (3d Cir. 2001) (citing *Selko v. Home Ins. Co.*, 139 F.3d 146, 152 n.3 (3d Cir. 1998)).

### 1.    *Intellectual Property Exclusion*

The General and Umbrella Policies provide an exclusion for personal and advertising injury that "aris[es] out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights." Docs. 46-6 at 28; 46-7 at 26; 46-8 at 75; 46-9 at 18; 46-10 at 16; 46-11 at 76. The Nationwide Plaintiffs conclude that coverage is barred under that provision, as *Arro-Mark* is based on "the misappropriation of Arro-Mark's trade secrets[,] . . . proprietary information, [and] trademark infringement." Doc. 62 at 36–37. The SKM Defendants,

38

relying on *Vitamin Energy*, contend that, regardless of whether the gravamen of the TAC advances a trademark infringement theory, coverage for other claims bypasses the intellectual property exclusion. Doc. 65 at 23.

A review of the remaining claims and allegations in the TAC confirms that they arise out of alleged actions by the SKM Defendants that fall either within the scope of the intellectual property exclusion provision or, as discussed below, the confidential information exclusions provision. As a general matter, the TAC pleads an alleged scheme to misappropriate Arro-Mark's "trade secrets and other proprietary business information." Doc. 46-5 at 2. Thus, five of the 11 remaining causes of action in the TAC expressly advance trade secret and trademark infringements, *id.* at 36–42, 47–55, 65–70, thus triggering the intellectual property exclusion.

Further, the remaining six claims also advance theories premised on the SKM Defendants' alleged infringement of Arro-Mark's intellectual property, such as trade secrets and trademarks. *Id.* at 42–43 (Count 3, common law unjust enrichment for alleged "misappropriation[s] of Plaintiff's trade secrets" and "proprietary

business information"), 44 (Count 4, common law misappropriation based on "Plaintiff's confidential trade secret information"), 46 (Count 5, common law breach of loyalty for alleged "use, disclose[,] or misappropriate Plaintiff's trade secrets"), 56–59 (Count 7, false association based on trademarks and design mark), 60–61 (Count 8, common law unfair competition based on "Plaintiff's confidential information" and "business and property rights"), 61–64 (Count 9, unfair competition based on trademarks and design marks).

Although the SKM Defendants are correct that "[a]n exclusion that may apply to only some allegations does not excuse [the insurer] from its obligation to defend the entire lawsuit," *Vitamin Energy*, 22 F.4th at 395, that obligation is contingent on the existence of "at least one claim [that] is potentially covered by the policy." *Post*, 691 F.3d at 521. As the Court discussed above, the coverage determination here rests on the SKM Defendants' use of Arro-Mark's "advertising idea" through misappropriation of their trademarks on SKM's website and promotional materials. By contrast, coverage does not arise out of any alleged trade dress infringement, as that theory was

40

dismissed from the *Arro-Mark* litigation, and the allegations in the TAC do not advance a cognizable trade dress infringement theory.

Thus, although the prior trade dress infringement claim may have fallen beyond the scope of the intellectual property exclusion, there are no longer any claims that are potentially covered by the policy, save those relying on trademark infringement and, as discussed below, the misappropriation of confidential proprietary information. As the causes of action in the TAC, and their supporting allegations, thus "[a]ris[e] out of" those infringements, *Madison*, 735 A.2d at 110, the Court holds that the intellectual property clause forecloses coverage.

### 2. *Confidential Information Exclusion*

To the extent certain allegations in the TAC do not fall squarely within the intellectual property exclusion provision addressed above, they nonetheless are encompassed by the confidential information exclusion. The General and Umbrella Policies are subject to an endorsement stating that the policies are inapplicable to a personal and advertising injury "arising out of any access to or disclosure of any . . . organization's confidential . . . information, including . . . trade secrets, processing methods, customer lists, financial information, . . . or any

41

other type of nonpublic information." Docs. 46-6 at 50; 46-7 at 48; 46-8 at 97; 46-9 at 41; 46-10 at 38; 46-11 at 97, 187.

The Nationwide Plaintiffs contend that this exclusion applies, because many of the allegations supporting the claims in the TAC arise out of the SKM Defendants' misappropriation, through Warren and Mamary, of Arro-Mark's "confidential ink/paint formulas, website code and design, customer lists, pricing structure, product processes, and nib guides." Doc. 62 at 38. The SKM Defendants attack whether that allegedly protected information may be deemed confidential, as it was publicly disclosed in Arro-Mark "promotional and advertising materials." Doc. 65 at 23–25. That position, however, misses the point.

Confidential information means "[k]nowledge or facts not in the public domain but known to some, esp[ecially] to those having a fiduciary duty not to misuse the knowledge or facts for their own advantage." *Confidential Information*, Black's Law Dictionary (12th ed. 2024). The TAC repeatedly pleads various forms of nonpublic information belonging to Arro-Mark that the SKM Defendants allegedly misappropriated. As a general matter, the TAC avers that Arro-Mark's grievances are based on the SKM Defendants' alleged scheme to

42

misappropriate Arro-Mark's "trade secrets and other proprietary business information." Doc. 46-5 at 2. The TAC also avers that Syal asked Warren to provide Arro-Mark's financial information, processing methods, and customer lists. *Id.* at 27 ("pricing list," "customer lists"), 29–30 ("pricing structure, product processes," "photographs and videos of [Arro-Mark]'s processes and factory, . . . suppliers['] names and information, pricing lists, and customer lists."). Further, the TAC alleges that the code and design for Arro-Mark's website were among the company's "proprietary business information," *id.* at 37–38, 40–41, 43, that took Mamary two years to design in the course of his employment. *Id.* at 30. Moreover, the TAC alleges that Mamary used the nonpublic code and design used for Arro-Mark's website to construct SKM's website in only a month, and provides a detailed comparison of the two webpages. *Id.* at 10–25, 44.

Those allegations fall precisely within the plain language of the policies' provisions excluding from coverage injury arising out of "access to or disclosure of any . . . confidential . . . information, including . . . trade secrets, processing methods, customer lists, financial information, . . . or any other type of nonpublic information." Docs. 46-6 at 50; 46-7

43

at 48; 46-8 at 97; 46-9 at 41; 46-10 at 38; 46-11 at 97, 187; *see also Citizens Ins. Co. of Am. v. Mullins Food Prods., Inc.*, 135 F.4th 1082, 1091–92 (7th Cir. 2025) (applying similar exclusion); *Great Am. Ins. Co. v. Beyond Gravity Media, Inc.*, 560 F. Supp. 3d 1024, 1038–39 (S.D. Tex. 2021) (same). Thus, to the extent that the allegations go beyond trademark and trade secret infringements encompassed by the intellectual property exclusion, the Court agrees with the Nationwide Plaintiffs that they fall within the scope of the confidential information exclusion.

## D.    Reimbursement of Defense Costs

Finally, the Court denies without prejudice the Nationwide Plaintiffs' request for recoupment of defense costs under the third general policy, numbered CG013200635005 and effective from April 17, 2022, to April 17, 2023. Doc. 46-8 at 65, 201. They assert that, "[b]ecause no duty to defend is owed, . . . [they are] entitled to reimbursement of defense costs associated with the defense of" the SKM Defendants. Doc. 62 at 40. The SKM Defendants failed to address this issue in their opposing brief, leading the Nationwide Plaintiffs to

44

conclude that they are indeed entitled to reimbursement of defense costs. Doc. 66 at 9.

The relevant terms state that:

A. The provisions of Paragraph B. are added to all Insuring Agreements that set forth a duty to defend under:

1. Section I of the Commercial General Liability[] . . .

B. If we initially defend an insured ("insured") or pay for an insured's ("insured's") defense but later determine that none of the claims ("claims"), for which we provided a defense or defense costs, are covered under this insurance, we have the right to reimbursement for the defense costs we have incurred.

The right to reimbursement under this provision will only apply to the costs we have incurred after we notify you in writing that there may not be coverage and that we are reserving our rights to terminate the defense or the payment of defense costs and to seek reimbursement for defense costs.

Doc. 46-8 at 65, 201.

Although the SKM Defendants failed to oppose the request for reimbursement, the Court lacks sufficient information to adjudicate this issue. The Nationwide Plaintiffs do not provide a specific amount for which they seek reimbursement, offer an accounting of that figure, or address any associated disputes between the parties, including whether reimbursement for defense costs prior to dismissal of the trade dress

45

claim in *Arro-Mark* is warranted. They likewise fail to offer any legal authority supporting their position, and thus have failed to carry their burden under Rule 12(c)(1)—namely, that they are entitled to judgment as a matter of law. *See Rosenau*, 539 F.3d at 221. As such, the Court cannot authorize a carte blanche reimbursement of defense costs, absent additional information. Therefore, the Nationwide Plaintiffs' request for reimbursement is denied, without prejudice.

## IV.  Conclusion

For the reasons set forth above, the Nationwide Plaintiffs' motion for judgment on the pleadings is **GRANTED IN PART AND DENIED IN PART**. A separate Order shall be issued.

Date: March 27, 2026          *s/ Phillip J. Caraballo*
                              Phillip J. Caraballo
                              United States Magistrate Judge

46